C. E. BROWER, Appellant, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellee.

No. 42283.

318

February 13, 1934.

Rehearing Denied June 23, 1934.

Willcockson & Willcockson, for appellant.

Gamble, Read, Howland & Blake and Shaw & Yoder, for appellee.

Mitchell, J.—C. E. Brower, the appellant, is a farmer, living on a farm a short distance from South English, Iowa. The appellee is a corporation, and operates a line of railroad in the state of Iowa and Missouri.

During the month of March, 1931, Brower purchased by telephone 217 head of hogs from Gillette & Leonard, who were live stock dealers at West Plains, Missouri. The hogs were to average around 116 pounds, and were unvaccinated. Neither Brower nor any of his representatives had seen the hogs until they arrived at South English. On the afternoon of March 25th the hogs were delivered to the Frisco Railway, a connecting carrier at West Plains, Missouri, for shipment to South English, Iowa, a distance of some 600 miles. Gillette & Leonard had ordered one double-deck car, but received two single-deck cars, into which the hogs were loaded, placing in one car 108 hogs and in the other 109 hogs. The cars in which they moved were clean, disinfected, and bedded with five bales of straw at the time the hogs were loaded, and the hogs moved under a uniform live stock contract signed by Gillette & Leonard, with instructions: "Do not unload in transit," and likewise a 36-hour

release was executed. At the time the hogs were delivered to the railroad company at West Plains, Missouri, they were good, healthy hogs. They were loaded early in the afternoon of March 25, 1931. The train was three hours late, and did not leave West Plains until about 7 that evening, which was Wednesday. Shipment moved en route according to the published schedule of the railroad company and its connecting carriers, and was subject to the transfers necessarily involved, passing through seven junction points. The hogs arrived at Riverside, Iowa, on schedule Saturday night, and on account of the railroad company having no scheduled train from that point to South English, were held for the next scheduled train the following Monday morning. They did not reach South English until between the hours of 3 and 4 in the afternoon of Monday, March 30, 1931, being on the road and in the cars five days. At the time they reached South English, the hogs were piled up in the ends of the car, and nineteen of them were dead. When the hogs were unloaded, they were taken to the Brower farm. Some seven or eight days later a veterinarian was called, and he pronounced the hogs suffering from cholera. Appellant commenced an action in tort against the railroad company to enforce the duty of the carrier to transport and carry live stock safely, alleging in his petition that he suffered damages due to the negligent and careless manner in which the hogs were handled and cared for by the railroad company while being transported. To the petition of the appellant the railroad company filed an answer, denying that it was indebted to the appellant, alleging that the hogs had been properly handled and cared for by the railroad company; that the hogs had been transported with all due dispatch and were delivered to the appellant at South English, Iowa, in accordance with the schedules of the appellee company and its connecting carriers; also alleging that the said hogs became sick because of a disease known as hog cholera, with which said animals were affected prior to the delivery to the connecting carrier of the appellee.

The case proceeded to trial. Evidence was offered, and at the close of all the evidence the defendant-appellee moved the court to direct a verdict, which motion the lower court sustained, and the jury, under the direction of the court, rendered a verdict in favor of the appellee railroad company. From said judgment and verdict the appellant has appealed to this court.

It is necessary to look to the record to ascertain whether or not there was sufficient evidence to submit the cause to the jury, or whether the lower court was right, saying as a matter of law upon the evidence offered that there was no liability on the part of the railroad company.

The record in this case shows that the hogs, 217 in number, were delivered in good, healthy condition, to the connecting carrier at West Plains, Missouri, early in the afternoon of March 25th; that they were loaded into two ordinary stock cars—108 in one car and 109 in the other car. At the time they were loaded, the cars were disinfected and bedded down with straw. The hogs were loaded about 3 o'clock in the afternoon, but did not leave West Plains until about 7 o'clock that evening. No caretaker accompanied the cars. This was known to the railroad company. The next afternoon at about 5 o'clock the hogs were fed at Fort Scott, Kansas. Three bushels of corn were given to each car. The method of feeding was by scattering the corn on the floor of the cars. This was on Thursday afternoon. The next time the hogs were fed was on Saturday, the 28th of March. At that time a bushel of corn was given to each car. Later on that same day they were fed another bushel of corn. The method of feeding was by sticking the corn through the cracks in the car. The record shows that they were again fed on Sunday morning and watered. Again each car received one bushel of corn. The hogs were not fed again by the railroad company. When the hogs arrived at South English, there were nineteen of them dead, and, the record shows, the live hogs were eating the dead hogs. The appellant complained to the agent of the railroad company of the condition of the hogs, and the agent advised the appellant to unload the hogs and then to file a claim against the railroad company for his damage. There is evidence of witnesses who saw the hogs on Saturday and on Sunday, while they were at Riverside, that the hogs were piled up in the ends of the cars and were squealing; that the bedding was wet, filthy, and smelling. After the hogs arrived at South English, Mr. Brower consulted with a veterinarian, to secure medicine for the hogs, and some seven or eight days later the veterinarian was called to Mr. Brower's place; a great many of the hogs having died in the meantime.

The rules of law governing cases of this kind have been well defined by this court. In the case of Swiney v. American Ex-

press Company, reported in 144 Iowa 342, on pages 344-5, 122 N. W. 957, it is said:

"The position taken by counsel seems to involve the thought that to sustain a recovery in cases of this character the shipper is bound to support his claim by an affirmative showing of negligence in the carrier. This, we think is not the rule which has heretofore been recognized and applied by this court, and is opposed to the prevailing doctrine approved by the courts of this country in general. The ordinary liability of a common carrier is that of an insurer against all risks incident to transportation, save such as result from the act of God or public enemy; and proof of the delivery of the goods to the carrier in sound condition and of their redelivery at the end of the route in damaged condition makes a sufficient case to sustain a recovery of damages by the shipper. Winne v. Railroad Co., 31 Iowa 583; Bennett v. Express Co., 83 Me. 236, 22 A. 159, 13 L. R. A. 33, 23 Am. St. Rep. 774. It has sometimes been suggested that this rule has no application to the shipment of live stock, but the great weight of authority is against the recognition of such exception. McCoy v. Railroad Co., 44 Iowa 424; Kinnick v. Railroad Co., 69 Iowa 665. There is, however, a well-recognized modification of the carrier's liability which, while applicable to the shipment of goods in general, finds its most frequent illustration in the shipment of live animals. This feature of the rule may be stated as follows: That while a carrier, whether negligent or otherwise, is generally liable as an insurer for loss and damage occurring to goods while in its hands for transportation, it is not liable in the absence of negligence on its part for any loss or damage caused by or resulting from the perishability or inherent weakness or vice in the subject of shipment."

Again, in the case of Bateham v. Chicago, M. & St. P. R. Co., reported in 195 Iowa, page 659, on page 668, 192 N. W. 818, this court said:

"Beyond doubt, it is the law that, where stock is delivered to the carrier in good condition, and the shipper does not accompany same, and the stock is found in bad condition when it reaches its destination, this proves *prima facie* a cause of action, and, if not met, authorizes a recovery by plaintiff. Gilbert Bros. v. Chicago, R. I. & P. R. Co., 156 Iowa 440; McCoy v. K. & D. M. R. Co., 44

Iowa 424; Chapin v. Chicago, M. & St. P. Ry. Co, 79 Iowa 582, 585. When this prima-facie showing is met, the burden shifts, and it is for the defendant to show that the injury was due to inherent vice or propensities of the animal shipped. Boehl v. Chicago, M. & St. P. R. Co., 44 Minn. 191, 46 N. W. 333; Illinois Central R. Co. v. Word, 149 Ky. 229, 147 S. W. 949. This rule rests on the doctrine that, where the shipper does not accompany the shipment, the defendant alone has knowledge, and therefore the duty of using that knowledge in disproof of the prima facie case made."

In Ruebel Bros. v. American Exp. Co., 190 Iowa 600, on pages 610, 611, 180 N. W. 658, this court said:

"Evidence is not always undisputed, though the statement of one witness is not contradicted by the statement of another. Though these employees testify that they used due care and testify to what they did and omitted to do, and though no witness clashes with it, still the law raises a conflict between this testimony and the evidentiary inference arising from the fact that the animal was sound when delivered to the carrier and was not sound at destination, or before reaching destination. This situation still leaves it a jury question whether the injury resulted from vice or any of the other excepted conditions. That is the holding in many of the cases that have already been cited. We may concede the jury could have found that the death was due to some of the excepted causes. But it does not follow that it was bound to so find, even though there was affirmative evidence that defendant exercised due care and diligence at all times. * * *

"The jury could find that, the weather being warm, the hog was panting, fretting, and puffing to such an extent as to attract the attention of the employees of defendant, and to advise them that the condition of the animal was unusual, and that yet nothing was done except to water the animal, which watering was done but three times between Parsons, Kansas, and Dallas, Texas. It could be found that one messenger employed by defendant thought the animal was probably in danger and reported that fact to the agent at Dennison, Texas, but that no one wired ahead for someone competent to deal with swine diseases, and that the animal was neither unloaded nor taken out of the crate, which, to all appearances, had become too small to hold it comfortably."

In the recent case of McCoy v. Wabash R. Co., 210 Iowa 1076, at page 1084, 231 N. W. 353, Justice Kindig, speaking for the court, said:

"Whether this conclusion is warranted, we do not now decide, but are constrained to hold there was sufficient evidence upon which the jury could find that the appellant has not met its burden of proof concerning the performance of its duty in giving the hogs sufficient water to drink. Much is said in the record about appellant's spraying the hogs and placing water in the car to cool them. At to whether the appellant sufficiently and properly sprayed the hogs, it was for the jury to decide. Ruebel Bros. v. American Exp. Co., 190 Iowa 600 (local citation 610). Also an additional question arises for appellant to answer. It is whether the animals were given sufficient water for their use in the hot weather. Doubt arises concerning the amount of water actually given the hogs for drinking purposes. Considerable evidence appears concerning appellant's spraying the cars, but little and uncertain testimony is presented regarding the drinking water for the hogs. Overheating, resulting in the deaths before named, may have been caused by neglect in furnishing sufficient drinking water. So the jury were justified, under the evidence, and theory eight of the trial, in finding that the appellant had not shown the full performance of its duty and freedom from negligence."

And so, in the case at bar, can it be said that the appellee has met its burden of proof concerning the performance of its duty in giving the hogs sufficient feed and water? The record shows that the hogs were loaded in ordinary stock cars early in the afternoon of March 25th at West Plains, Missouri. They were starting on a trip which the railroad company knew was a distance of 600 miles from the small town in Missouri where they were loaded to the town of South English in Iowa. There was no caretaker, and the railroad company was aware of this. The railroad company knew at the time these hogs started on their journey it would take from the afternoon of March 25th to the afternoon of March 30th before they would reach their destination, a period of five days. The duty of seeing that these hogs were properly cared for, properly fed, and properly watered, rested upon the railroad company. How did the railroad company fulfill that duty? On the afternoon of Thursday, the day following the loading of the hogs, they were fed by the

railroad company, each car three sacks of corn, which were estimated to contain three bushels of corn. We then find that no feed or water was given these hogs until the second day following, Saturday, the 28th. Then each car of hogs was fed one bushel of corn. In this state of corn and hogs this court is familiar with the fact that in a bushel of corn there would be about an ear for each of the 108 hogs in the car. But, the record shows, this corn was fed through the cracks in the side of the car, not an ear to each hog, but simply stuck through the cracks of the cars. So it is fair to assume that each hog did not receive his ear of corn. Some of the hogs no doubt received more than their share of the bushel of corn and others did not receive any. The record then shows that on the same evening, when the cars reached Riverside, Iowa, the hogs were again fed one bushel to a car, and watered. On Sunday, while they were still in the car at Riverside, the hogs were fed one bushel of corn to a car and watered. The method of feeding or watering does not appear in the record. They were not fed after Sunday, although they stayed in the cars until late Monday afternoon. In other words, this record shows that these hogs were in good condition when they left Missouri; that for five days and nights, while being taken on this trip of 600 miles by the railroad company, they were never at any time removed from the cars; that the total amount of corn given to each car in these five days was six bushels, and, it should be noted, three bushels were given the afternoon of the first day of the trip. In other words, on the last four days, these hogs were fed three bushels of corn to each car, three bushels of corn for 108 or 109 hogs for four days, the manner of feeding being either by sticking the corn through the cracks of the car or scattering it upon the floor of the car. In addition to this, we have the evidence that there were 19 dead hogs when the shipment arrived at its destination; that the live hogs were so hungry they were eating the dead hogs. A hog, surprising as it may seem, is a delicate animal; it must have feed and water. This was known to the railroad company, and it was the appellee's duty to see that proper feed and water were furnished these hogs while they were in the care of the railroad company.

In the face of such a record can it be said, as a matter of law, that the appellee company has met its burden of proof concerning the performance of its duty in giving the hogs sufficient water and feed? We cannot say whether it has or not, but certainly there was

sufficient evidence in this record upon which the jury could have found that the appellee railroad company had failed to fufill the duty required of it to see that the hogs had sufficient feed and water.

The appellee claimed that the theory that the hogs died from cholera is infinitely more reasonable and more consistent with the cause of death than the theory of the appellant that the hogs died due to the failure properly to care for them. The appellee bases this upon the testimony of a veterinarian who was called by the appellant to examine the hogs. The veterinarian was called some seven or eight days after the hogs had been unloaded and placed upon the farm of the appellant. It is true that this veterinarian, a man of education, training, and experience in his profession, testified that in his judgment the hogs died from cholera. But the record shows he did not see these hogs or examine same until seven or eight days after they had been unloaded and placed upon the appellant's farm. Hog cholera is a deadly disease. It is due to a form of germ life, so small that it is invisible to the naked eye or through a microscope. The hog cholera germ has never as yet been isolated. The period of incubation is from four to six days; that is, from the time the hog has picked up this germ until it has notable symptoms it is from four to six days. In addition to the veterinarian, the appellee also offered as a witness a field veterinarian for the Fort Dodge Serum Company of Fort Dodge, Iowa, which is one of the largest and best known manufacturers of hog cholera serum. This expert testified relative to the symptoms that hogs have when they have cholera. These experts also testified that a hog will be more susceptible to a disease when its resistance is lowered. But it must be kept in mind that the experts testifying here in regard to the cholera based their testimony upon an examination which was made some seven or eight days after the hogs had been unloaded. Or, in other words, some twelve or thirteen days after the hogs had left Missouri. The record shows that the period of incubation of cholera germs is anywhere from four to six days. Thus, in face of the record that these hogs were in good, healthy condition at the time they were loaded; that they were kept in stock cars for a period of five days; that they were fed and watered only as set out in this opinion; that at the time they arrived at their destination there were 19 hogs dead, and that the live ones were piled up in the end of the car, eating the dead hogs; that the evidence covering the question of cholera was not obtained for some seven or eight days after the hogs were

unloaded, we cannot say that as a matter of law these hogs died from cholera. That again was a question for the jury. The lower court should have submitted this cause to the jury for its determination, and in so failing to do the lower court erred, and this case must be, and it is hereby, reversed and remanded.

CLAUSSEN, C. J., and EVANS, KINDIG, ANDERSON, and KINTZINGER, JJ., concur.